**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

JESSE VELASQUEZ,                :
                                :   Civil Action No. 09-3230 (RBK)
         Plaintiff,             :
                                :
    v.                          :   **OPINION**
                                :
DR. ALLEN MARTIN, et al.,       :
                                :
         Defendants.            :

**APPEARANCES:**

Plaintiff pro se                Counsel for Defendants
Jesse Velasquez                 Dr. Allen Martin and
709 N. 6 Street                 Correctional Medical Services
Camden, NJ  08102                   Richard Han Kim
                                    Sean Robins
                                    Sean X. Kelly
                                    Marks O'Neill O'Brien &
                                        Courtney, P.C.
                                    6981 North Park Drive
                                    Pennsauken, NJ 08109

**KUGLER**, District Judge

This matter was opened to the Court by Plaintiff Jesse Velasquez, formerly a prisoner confined at South Woods State Prison, filing a Complaint alleging various violations of his constitutional rights including, most pertinent to the present proceeding, violation of his Eighth Amendment right to adequate medical care.

Now pending before this Court is the Motion [30] of Defendants Dr. Allen Martin and Correctional Medical Services,

Inc., to Dismiss the claims against them for failure to state a claim.

## I. BACKGROUND

According to the Complaint, Plaintiff was confined at South Woods State Prison at the time of the events complained of. Plaintiff alleges that he is an amputee with complicated medical needs. Plaintiff's factual allegations regarding his medical needs and care at the heart of his claims are set forth as follows:

>     a. On or about May 1, 2008 plaintiff Jesse Velasquez (JV) right leg and foot was experiencing swelling and he informed the morning shift nurse of this discomfort and his complaint was ignored.
>
>     b. On June 11, this complaint was made and JV was examined by Dr. Martin and nurse which JV was given 10 m.g. of comaden a blood thinner pill which Dr. Martin thought was a blood clot in the right leg and foot. The doctor never requested an ultra sound to confirm a blood clot. The medication was administered for approximately 3 days in the evening (8:00 p.m.) and was given a blood thinner by injection to his stomach area which the name of the medication was given during the morning shift which the blood thinner name began with the letter "l" for approximately a week then changed to 7.5 m.g. for about a couple of days during the evening until Dr. Martin stopped administering the Comaden on June 28, 2008 because of excessive bleeding JV was having in his left and right buttock area. The plaintiff was also experiencing bleeding from his colostomy and urostomy bags.
>
>     c. On June 25, 2008 Nurse Denise entered JV room to administer wound treatment (left and right buttock area and right outside ankle). When nurse Denise started JV treatment she informed the plaintiff that bleeding had increased in the buttocks area. JV asked her why don't you send me to the hospital before the bleeding gets worse, which she replied if she thought I

needed to be admitted she would do so. JV request to be admitted to hospital was denied. At that time JV made Denise aware that he had a history being anemic.

    d. On June 26, 2008 the nurse entered JV room for his daily wound treatment again the bleeding had increased from my wound area, which I informed the nurse that I was bleeding from the previous day and would like to be admitted to the hospital and was advised that everything was under control. This was JV second request in two days to be admitted to hospital.

    e. On June 27, 2008 nurse Denise entered JV room to administer early morning wound treatment again JV was informed that he was bleeding excessively from the same area and she informed JV that she was going to pressure pack his wound using several cling wraps, gauze and ADB gauze's with pads with Tegadem tape to hold it in place, JV also had blood in his colostomy and urostomy bags. At approximately 5:00 p.m. nurse Terry entered JV room to administer wound treatment and also informed JV of the excessive bleeding in his left and right buttock area, again JV showed her his colostomy and urostomy bag containing excessive amounts of blood.

    Late in the evening nurse Terry examined JV wounds and noticed that his wounds needed to get changed again due to excessive bleeding, so nurse Terry also pressure packed his wounds using whole cling wraps, gauzes and ADB gauzes with Tegaderm tape. JV questioned nurse Terry in regards to his need to be admitted to the hospital and was reassured by the nurse that he would be alright and not to worry. Again JV was denied hospitalization.

    f. On June 28, 2008 nurse Denise entered JV room to administer wound treatment to the left and right buttock area along with the outer ankle area, nurse Denise informed JV that his wounds are continuing to bleed excessively and she was administering a pressure pack to JV wounds, additionally she checked the colostomy and urostomy bags for signs of blood and again saw blood.

    Approximately 5:00 p.m. nurse Terry entered JV room to administer wound treatments to the left and right buttock area and right outer ankle area. Nurse

Terry pressure packed JV wounds and requested that JV remain in bed for the rest of the night due to excessive bleeding which JV continued to have from his wounds as well as colostomy and urostomy bags. Later that evening nurse Terry changed JV wound dressing due to excessive bleeding that continued to occur. By pressure packing my wounds I asked nurse Terry why haven't I been sent to the hospital knowing that this condition took place for approximately 4 days which she was aware that I was bleeding excessively. Again JV informed the nurse that he wished to be admitted to the hospital and again JV request was denied.

     g.  On June 29, 2008 nurse Denise entered my room to administer early morning wound treatment to the left and right buttock area and outer ankle area. She pressure packed JV wounds and checked the colostomy and urostomy bags for blood which blood was present in both bags. JV was informed to stay in bed again due to excessive bleeding which JV did. Nurse Denise returned to the room to look at JV wounds at approximately 12:30 p.m. and noticed JV was still bleeding excessively which she again pressure packed JV wounds.

     h.  On June 30, 2008 C.M.S. Administrator Ms. Lynn entered JV room to speak to JV because he had requested to speak with this individual for over a week. Ms. Lynn entered the room and asked JV what was the problem, JV had made mention about his motorized wheelchair ... . Next JV informed her about the excessive bleeding which she, Dr. Martin, Nurse Denise and CNA Jaime were now all in JV room which each of them looked at the wounded area. Dr. Martin, evaluated my buttocks area to see about the excessive bleeding and check JV colostomy and urology bag which he found blood. Soon after Dr. Martin decided to culturize [sic] my buttock area and applied a pressure pack to hold it in place, at which time JV asked Dr. Martin in the presence of CMS Administrator Lynn, nurse Denise and CNA Jaime that I need to go to the hospital because my condition was getting worse and he responded by saying if he thought it was an urgent matter which needed immediate attention he would have sent me to the hospital. Approximately 5:00 p.m. and late in the evening nurse Terry came to my room to administer my wound treatment and to check my colostomy and urology bags which contained blood.

> i. On July 1, 2008, at 4:00 a.m. nurse Terry came into my room to administer my wound treatment due to excessive bleeding that I was having in my buttocks area, at this time I was feeling nauseous, dehydrated, suffering from a fever, weak out of breath and suffering from diarrhea. I made nurse Terry aware of this and she continued to apply my pressure packing to my wound and called emergency (911). I was rushed to South Jersey Regional Medical Center in Vineland at approximately 4:30 a.m. The doctors at S.J.R.M.C. had to work extremely hard to keep me alive in the emergency room (ER) due to the lack of proper care at South Woods State Prison. I was advised that I was admitted to S.J.R.M.C. because I was over medicated with Comaden pills and because of a blood thinner injection which was requested by Dr. Martin, which JV took for 3 weeks which caused JV to bleed excessively from his buttocks area along with the blood which was found in his colostomy and urology bags. During JV 4 day stay at the above named facility he was given a blood transfusion which 10 units of blood and 4 pints of plasma was given to him. ...

(Complaint, ¶ 6.) Plaintiff also alleges that during this time he was in constant severe pain and that the defendants ignored his complaints of pain. (Complaint, First Cause of Action, ¶ 11.)

Plaintiff alleges that Correctional Medical Services, Inc., "set the policies and procedures they expect the medical staff at the facility to follow in order to save money and make a profit, usually at the expense of inmate medical care." (Complaint, ¶ 4.e.) He also alleges that all defendants, including Correctional Medical Services, Inc., violated his Eighth Amendment right to adequate medical care by setting policies which did not allow for the Plaintiff's needs, by jeopardizing the safety of the Plaintiff in order to save time and money, and

5

by failing to set policies or procedures for the adequate administration of substitute blood thinners and necessary medical equipment from the hospital and/or emergency units.  (Complaint, First Cause of Action.)

Defendants Dr. Martin and Correctional Medical Services, Inc. (collectively, the "Moving Defendants") have moved to dismiss the Complaint on the following grounds (1) Plaintiff has failed to establish a custom or policy of Correctional Medical Services, Inc. ("CMS") violating his civil rights, and (2) Plaintiff's complaint fails to allege deliberate indifference by Dr. Martin.  In his response, Plaintiff failed to address the legal arguments made by the Defendants.

## II.   DISMISSAL FOR FAILURE TO STATE A CLAIM

This Court must dismiss, at any time, certain in forma pauperis and prisoner actions that are frivolous, malicious, fail to state a claim, or seek monetary relief from a defendant who is immune from such relief.  See 28 U.S.C. § 1915(e)(2) (in forma pauperis actions); 28 U.S.C. § 1915A (actions in which prisoner seeks redress from a governmental defendant); 42 U.S.C. § 1997e (prisoner actions brought with respect to prison conditions).  See also Fed.R.Civ.P. 12(b)(6), permitting a party to move to dismiss a claim in a civil action for "failure to state a claim upon which relief can be granted."

In determining the sufficiency of a pro se complaint, the Court must be mindful to construe it liberally in favor of the plaintiff. Haines v. Kerner, 404 U.S. 519, 520-21 (1972); United States v. Day, 969 F.2d 39, 42 (3d Cir. 1992). The Court must "accept as true all of the allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the plaintiff." Morse v. Lower Merion School Dist., 132 F.3d 902, 906 (3d Cir. 1997).

In addition, any complaint must comply with the pleading requirements of the Federal Rules of Civil Procedure.

Rule 8(a)(2) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." A complaint must plead facts sufficient at least to "suggest" a basis for liability. Spruill v. Gillis, 372 F.3d 218, 236 n.12 (3d Cir. 2004). "Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'" Erickson v. Pardus, 551 U.S. 89, 93 (2007) (citations omitted).

> While a complaint ... does not need detailed factual allegations, a plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do, see Papasan v. Allain, 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986) (on a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation"). Factual allegations must be enough to raise a right to relief above the speculative level ... .

Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007) (citations omitted).

The Supreme Court has demonstrated the application of these general standards to a Sherman Act conspiracy claim.

> In applying these general standards to a § 1 [conspiracy] claim, we hold that stating such a claim requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made. Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement. And, of course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and "that a recovery is very remote and unlikely." ... It makes sense to say, therefore, that an allegation of parallel conduct and a bare assertion of conspiracy will not suffice. Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality. Hence, when allegations of parallel conduct are set out in order to make a § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action.
>
> The need at the pleading stage for allegations plausibly suggesting (not merely consistent with) agreement reflects the threshold requirement of Rule 8(a)(2) that the "plain statement" possess enough heft to "sho[w] that the pleader is entitled to relief." A statement of parallel conduct, even conduct consciously undertaken, needs some setting suggesting the agreement necessary to make out a § 1 claim; without that further circumstance pointing toward a meeting of the minds, an account of a defendant's commercial efforts stays in neutral territory. ...

Twombly, 550 U.S. at 556-57 (citations and footnotes omitted).

The Court of Appeals for the Third Circuit has held, in the context of a § 1983 civil rights action, that the Twombly pleading standard applies outside the § 1 antitrust context in which it was decided. See Phillips v. County of Allegheny, 515 F.3d 224, 234 (3d Cir. 2008) ("we decline at this point to read Twombly so narrowly as to limit its holding on plausibility to the antitrust context").

> Context matters in notice pleading. Fair notice under Rule 8(a)(2) depends on the type of case -- some complaints will require at least some factual allegations to make out a "showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the ... claim is and the grounds upon which it rests." Indeed, taking Twombly and the Court's contemporaneous opinion in Erickson v. Pardus, 127 S.Ct. 2197 (2007), together, we understand the Court to instruct that a situation may arise where, at some point, the factual detail in a complaint is so undeveloped that it does not provide a defendant the type of notice of claim which is contemplated by Rule 8. Put another way, in light of Twombly, Rule 8(a)(2) requires a "showing" rather than a blanket assertion of an entitlement to relief. We caution that without some factual allegation in the complaint, a claimant cannot satisfy the requirement that he or she provide not only "fair notice," but also the "grounds" on which the claim rests.

Phillips, 515 F.3d at 232 (citations omitted).

More recently, the Supreme Court has emphasized that, when assessing the sufficiency of any civil complaint, a court must distinguish factual contentions -- which allege behavior on the part of the defendant that, if true, would satisfy one or more elements of the claim asserted -- and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory

statements." <u>Ashcroft v. Iqbal</u>, 129 S.Ct. 1937, 1949 (2009). Although the Court must assume the veracity of the facts asserted in the complaint, it is "not bound to accept as true a legal conclusion couched as a factual allegation." <u>Id.</u> at 1950. Thus, "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." <u>Id.</u>

> Therefore, after <u>Iqbal</u>, when presented with a motion to dismiss for failure to state a claim, district courts should conduct a two-part analysis. First, the factual and legal elements of a claim should be separated. The District Court must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions. Second, a District Court must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a "plausible claim for relief." In other words, a complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to "show" such an entitlement with its facts. <u>See</u> <u>Phillips</u>, 515 F.3d at 234-35. As the Supreme Court instructed in <u>Iqbal</u>, "[w]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not 'show[n]'-'that the pleader is entitled to relief.'" This "plausibility" determination will be "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."

<u>Fowler v. UPMC Shadyside</u>, 578 F.3d 203, 210-11 (3d Cir. 2009) (citations omitted).

### III. <u>DISCUSSION</u>

The Eighth Amendment to the United States Constitution, applicable to the individual states through the Fourteenth Amendment, prohibits the states from inflicting "cruel and

10

unusual punishments" on those convicted of crimes. Rhodes v. Chapman, 452 U.S. 337, 344-46 (1981). This proscription against cruel and unusual punishment requires that prison officials provide inmates with adequate medical care. Estelle v. Gamble, 429 U.S. 97, 103-04 (1976). In order to set forth a cognizable claim for a violation of his right to adequate medical care, an inmate must allege: (1) a serious medical need; and (2) behavior on the part of prison officials that constitutes deliberate indifference to that need. Id. at 106.

To satisfy the first prong of the Estelle inquiry, the inmate must demonstrate that his medical needs are serious. "Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" Hudson v. McMillian, 503 U.S. 1, 9 (1992). Serious medical needs include those that have been diagnosed by a physician as requiring treatment or that are so obvious that a lay person would recognize the necessity for a doctor's attention, and those conditions which, if untreated, would result in lifelong handicap or permanent loss. Monmouth County Correctional Institutional Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987), cert. denied, 486 U.S. 1006 (1988).

The second element of the Estelle test requires an inmate to show that prison officials acted with deliberate indifference to

11

his serious medical need. "Deliberate indifference" is more than mere malpractice or negligence; it is a state of mind equivalent to reckless disregard of a known risk of harm. <u>Farmer v. Brennan</u>, 511 U.S. 825, 837-38 (1994). Furthermore, a prisoner's subjective dissatisfaction with his medical care does not in itself indicate deliberate indifference. <u>Andrews v. Camden County</u>, 95 F.Supp.2d 217, 228 (D.N.J. 2000); <u>Peterson v. Davis</u>, 551 F.Supp. 137, 145 (D. Md. 1982), <u>aff'd</u>, 729 F.2d 1453 (4th Cir. 1984). Similarly, "mere disagreements over medical judgment do not state Eighth Amendment claims." <u>White v. Napoleon</u>, 897 F.2d 103, 110 (3d Cir. 1990). "Courts will disavow any attempt to second-guess the propriety or adequacy of a particular course of treatment ... [which] remains a question of sound professional judgment. <u>Implicit in this deference to prison medical authorities is the assumption that such informed judgment has, in fact, been made.</u>" <u>Inmates of Allegheny County Jail v. Pierce</u>, 612 F.2d 754, 762 (3d Cir. 1979) (internal quotation and citation omitted) (emphasis added). Even if a doctor's judgment concerning the proper course of a prisoner's treatment ultimately is shown to be mistaken, at most what would be proved is medical malpractice and not an Eighth Amendment violation. <u>Estelle</u>, 429 U.S. at 105-06; <u>White</u>, 897 F.2d at 110.

"Where prison authorities deny reasonable requests for medical treatment, however, and such denial exposes the inmate

'to undue suffering or the threat of tangible residual injury,' deliberate indifference is manifest.  Similarly, where 'knowledge of the need for medical care [is accompanied by the] ... intentional refusal to provide that care,' the deliberate indifference standard has been met.  ...  Finally, deliberate indifference is demonstrated '[w]hen ... prison authorities prevent an inmate from receiving recommended treatment for serious medical needs or deny access to a physician capable of evaluating the need for such treatment." Monmouth County Corr. Inst. Inmates v. Lanzaro, 834 F.2d at 346 (citations omitted). "Short of absolute denial, 'if necessary medical treatment [i]s ... delayed for non-medical reasons, a case of deliberate indifference has been made out." Id. (citations omitted). "Deliberate indifference is also evident where prison officials erect arbitrary and burdensome procedures that 'result[] in interminable delays and outright denials of medical care to suffering inmates.'" Id. at 347 (citation omitted).

A.   The Claim Against Dr. Martin

Here, the Moving Defendants allege that Plaintiff has failed to allege facts from which "deliberate indifference" could be inferred.  Instead, according to the Moving Defendants, Plaintiff has merely alleged disagreement and dissatisfaction with the care that was provided.

This Court disagrees.  Plaintiff alleges that for a period of one week, following a long period of administration of two blood thinners, he bled excessively both externally, from wounds on his buttocks, and internally, as evidence by blood in two ostomy bags, until he reached a state that required emergency hospitalization and multiple transfusions.  There is no suggestion, in the facts pleaded in the Complaint, that Dr. Martin made any effort to determine the cause of the excessive bleeding or to treat the excessive bleeding, except to apply bandages and pressure packs to absorb the blood from Plaintiff's <u>external</u> wounds.  From the allegations of the Complaint, Dr. Martin made <u>no</u> effort to diagnose or treat Plaintiff's <u>internal</u> bleeding.

As noted above, "[i]mplicit in this deference to prison medical authorities is the assumption that such informed judgment has, in fact, been made."  <u>Inmates of Allegheny County Jail v. Pierce</u>, 612 F.2d 754, 762 (3d Cir. 1979) (internal quotation and citation omitted).  Thus, "an <u>inadvertent</u> failure to provide adequate medical care cannot be said to constitute 'an unnecessary and wanton infliction of pain' or 'to be repugnant to the conscience of mankind.'"  <u>Estelle</u>, 429 U.S. at 105-06 (emphasis added).  Here, however, the facts alleged do not suggest an inadvertent failure to provide adequate medical care.  To the contrary, the allegations are that Dr. Martin, having

14

administered two blood thinners, watched Plaintiff bleed excessively both internally and externally for a period of a week without making any effort to diagnose the cause of the bleeding, or to stop the bleeding, or to replace the lost blood, or to address Plaintiff's complaints of severe pain, all of which led to Plaintiff's emergency need for hospitalization and transfusions.  The allegations of the Complaint are sufficient to permit an inference of "deliberate indifference."  Cf., e.g., White v. Napoleon, 897 F.2d 103, 109 (3d Cir. 1990) (from persistent conduct in the face of resultant pain and risk of permanent injury, one reasonably may infer that the doctor is either intentionally inflicting pain on prisoners or is deliberately indifferent to their medical needs).

B.   The Claim Against CMS

With respect to the claim against CMS, the Moving Defendants argue that CMS cannot be held liable for the acts of its individual employees (to the extent the Court finds that the Complaint states a claim against individual employees of CMS), under a theory of vicarious liability, and that Plaintiff has failed adequately to demonstrate a custom or policy which triggered a constitutional violation.

This Court agrees that it is well-settled that the doctrine of respondeat superior cannot be a basis for Section 1983 liability.  See Monell v. New York City Dept. of Soc. Servs, 436

U.S. 658, 691 (1978); Durmer v. O'Carroll, 991 F.2d 64, 69 n.14 (3d Cir. 1993). Thus, a corporation under contract with the state cannot be held liable for the acts of its employees or agents. See Natale v. Camden County Corr. Facility, 318 F.3d 575, 583 (3d Cir. 2003).

CMS may, however, be held liable for the acts of an employee if those acts are deemed the result of a policy or custom of CMS, where the inadequacy of an existing practice is so likely to result in the violation of constitutional rights that CMS can reasonably be said to have been deliberately indifferent to the plaintiff's serious medical needs.

> A policy is made "when a decisionmaker possess[ing] final authority to establish municipal policy with respect to the action issues a final proclamation, policy or edict." Kneipp v. Tedder, 95 F.3d 1199, 1212 (3d Cir. 1996) (quoting Pembaur v. City of Cincinnati, 475 U.S. 469, 481, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986) (plurality opinion)). A custom is an act "that has not been formally approved by an appropriate decisionmaker," but that is "so widespread as to have the force of law." [Bd. of County Comm'rs of Bryan County, Oklahoma v. Brown, 520 U.S. 397, 404 (1997).]
>
>  There are three situations where acts of a government employee may be deemed to be the result of a policy or custom of the governmental entity for whom the employee works, thereby rendering the entity liable under § 1983. The first is where "the appropriate officer or entity promulgates a generally applicable statement of policy and the subsequent act complained of is simply an implementation of that policy." The second occurs where "no rule has been announced as policy but federal law has been violated by an act of the policymaker itself." Finally, a policy or custom may also exist where "the policymaker has failed to act affirmatively at all, [though] the need to take some action to control the agents of the government 'is so

16

>       obvious, and the inadequacy of existing practice so
>       likely to result in the violation of constitutional
>       rights, that the policymaker can reasonably be said to
>       have been deliberately indifferent to the need.'"

Natale, 318 F.3d at 584 (footnote and citations omitted).

Here, Plaintiff has invoked two of the three "custom or policy" provisions: he alleges that there was a policy to deliver care based primarily upon economic considerations and he alleges that there was no policy regarding the administration of blood thinners, though one was needed. These allegations are directly tied to the allegations that his hospitalization was delayed and that the blood thinners were administered and monitored in a manner to violated his Eighth Amendment rights.

Of course, Plaintiff must, in the future, come forward with evidence to establish the truth of these allegations and that these policies and customs led to constitutional violations by CMS employees. All this Court holds at this juncture is that the allegations are sufficient to avoid dismissal.

## IV.  CONCLUSION

For the reasons set forth above, the Motion [30] to dismiss will be denied.[1]  An appropriate order follows.

s/Robert B. Kugler<br>
Robert B. Kugler<br>
United States District Judge

Dated: June 13, 2011

---

[1] As this Court has held that the constitutional claims asserted against Dr. Martin and CMS will not be dismissed, this Court also will decline to dismiss the pendent state law claims for medical malpractice.