**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

JESSE VELASQUEZ, Plaintiff,

v.

DR. ALLEN MARTIN, et al., Defendants.

Civil Action No. 09-3230 (RBK)

**OPINION**

**APPEARANCES:**

Plaintiff pro se
Jesse Velasquez
709 N. 6 Street
Camden, NJ 08102

Counsel for Defendant
Lynn Kwepp
a/k/a Lynn Kwap
Sean Robins
Marks O'Neill O'Brien & Courtney, P.C.
6981 North Park Drive
Pennsauken, NJ 08109

**KUGLER**, District Judge

This matter was opened to the Court by Plaintiff Jesse Velasquez, formerly a prisoner confined at South Woods State Prison, filing a Complaint alleging various violations of his constitutional rights including, most pertinent to the present proceeding, violation of his Eighth Amendment right to adequate medical care.

Now pending before this Court is the Motion [75] of Defendant Lynn Kwap[1] to Dismiss the claims against her for failure to state a claim.

## I. BACKGROUND

According to the Complaint, Plaintiff was confined at South Woods State Prison at the time of the events complained of. Plaintiff alleges that he is an amputee with complicated medical needs. Plaintiff's factual allegations regarding his medical needs and care at the heart of his claims are set forth as follows:

> a. On or about May 1, 2008 plaintiff Jesse Velasquez (JV) right leg and foot was experiencing swelling and he informed the morning shift nurse of this discomfort and his complaint was ignored.
>
> b. On June 11, this complaint was made and JV was examined by Dr. Martin and [unidentified] nurse which JV was given 10 m.g. of comaden a blood thinner pill which Dr. Martin thought was a blood clot in the right leg and foot. The doctor never requested an ultra sound to confirm a blood clot. The medication was administered for approximately 3 days in the evening (8:00 p.m.) and was given a blood thinner by injection to his stomach area which the name of the medication was given during the morning shift which the blood thinner name began with the letter "l" for approximately a week then changed to 7.5 m.g. for about a couple of days during the evening until Dr. Martin stopped administering the Comaden on June 28, 2008 because of excessive bleeding JV was having in his left and right buttock area. The plaintiff was also experiencing bleeding from his colostomy and urostomy bags.

[1] Plaintiff incorrectly identifies the Defendant in the Complaint as "Lynn Kwepp." She will be referred to herein by her correct name, "Lynn Kwap."

c. On June 25, 2008 Nurse Denise entered JV room to administer wound treatment (left and right buttock area and right outside ankle). When nurse Denise started JV treatment she informed the plaintiff that bleeding had increased in the buttocks area. JV asked her why don't you send me to the hospital before the bleeding gets worse, which she replied if she thought I needed to be admitted she would do so. JV request to be admitted to hospital was denied. At that time JV made Denise aware that he had a history being anemic.

d. On June 26, 2008 the [unidentified] nurse entered JV room for his daily wound treatment again the bleeding had increased from my wound area, which I informed the nurse that I was bleeding from the previous day and would like to be admitted to the hospital and was advised that everything was under control. This was JV second request in two days to be admitted to hospital.

e. On June 27, 2008 nurse Denise entered JV room to administer early morning wound treatment again JV was informed that he was bleeding excessively from the same area and she informed JV that she was going to pressure pack his wound using several cling wraps, gauze and ADB gauze's with pads with Tegadem tape to hold it in place, JV also had blood in his colostomy and urostomy bags. At approximately 5:00 p.m. nurse Terry entered JV room to administer wound treatment and also informed JV of the excessive bleeding in his left and right buttock area, again JV showed her his colostomy and urostomy bag containing excessive amounts of blood.

Late in the evening nurse Terry examined JV wounds and noticed that his wounds needed to get changed again due to excessive bleeding, so nurse Terry also pressure packed his wounds using whole cling wraps, gauzes and ADB gauzes with Tegaderm tape. JV questioned nurse Terry in regards to his need to be admitted to the hospital and was reassured by the nurse that he would be alright and not to worry. Again JV was denied hospitalization.

f. On June 28, 2008 nurse Denise entered JV room to administer wound treatment to the left and right buttock area along with the outer ankle area, nurse Denise informed JV that his wounds are continuing to

bleed excessively and she was administering a pressure pack to JV wounds, additionally she checked the colostomy and urostomy bags for signs of blood and again saw blood.

Approximately 5:00 p.m. nurse Terry entered JV room to administer wound treatments to the left and right buttock area and right outer ankle area. Nurse Terry pressure packed JV wounds and requested that JV remain in bed for the rest of the night due to excessive bleeding which JV continued to have from his wounds as well as colostomy and urostomy bags. Later that evening nurse Terry changed JV wound dressing due to excessive bleeding that continued to occur. By pressure packing my wounds I asked nurse Terry why haven't I been sent to the hospital knowing that this condition took place for approximately 4 days which she was aware that I was bleeding excessively. Again JV informed the nurse that he wished to be admitted to the hospital and again JV request was denied.

g. On June 29, 2008 nurse Denise entered my room to administer early morning wound treatment to the left and right buttock area and outer ankle area. She pressure packed JV wounds and checked the colostomy and urostomy bags for blood which blood was present in both bags. JV was informed to stay in bed again due to excessive bleeding which JV did. Nurse Denise returned to the room to look at JV wounds at approximately 12:30 p.m. and noticed JV was still bleeding excessively which she again pressure packed JV wounds.

**h. On June 30, 2008 C.M.S. Administrator Ms. Lynn entered JV room to speak to JV because he had requested to speak with this individual for over a week. Ms. Lynn entered the room and asked JV what was the problem, JV had made mention about his motorized wheelchair which was suppose to had been repaired and went on to explain that he wrote a remedy on or about April 1, 2008 and received a response on or about May 8, 2008 informing JV that the wheelchair was sent out for repairs, which was not true because JV had saw the wheelchair in the storage area near the nurses office is located and Ms. Lynn informed JV that she would look into that matter and see if the wheelchair could be repaired. Next JV informed her about the excessive bleeding which she, Dr. Martin, Nurse Denise and CNA**

**Jaime were now all in JV room which each of them looked at the wounded area. Dr. Martin, evaluated my buttocks area to see about the excessive bleeding and check JV colostomy and urology bag which he found blood. Soon after Dr. Martin decided to culturize [sic] my buttock area and applied a pressure pack to hold it in place, at which time JV asked Dr. Martin in the presence of CMS Administrator Lynn, nurse Denise and CNA Jaime that I need to go to the hospital because my condition was getting worse and he responded by saying if he thought it was an urgent matter which needed immediate attention he would have sent me to the hospital.** Approximately 5:00 p.m. and late in the evening nurse Terry came to my room to administer my wound treatment and to check my colostomy and urology bags which contained blood.

i. On July 1, 2008, at 4:00 a.m. nurse Terry came into my room to administer my wound treatment due to excessive bleeding that I was having in my buttocks area, at this time I was feeling nauseous, dehydrated, suffering from a fever, weak out of breath and suffering from diarrhea. I made nurse Terry aware of this and she continued to apply my pressure packing to my wound and called emergency (911). I was rushed to South Jersey Regional Medical Center in Vineland at approximately 4:30 a.m. The doctors at S.J.R.M.C. had to work extremely hard to keep me alive in the emergency room (ER) due to the lack of proper care at South Woods State Prison. I was advised that I was admitted to S.J.R.M.C. because I was over medicated with Comaden pills and because of a blood thinner injection which was requested by Dr. Martin, which JV took for 3 weeks which caused JV to bleed excessively from his buttocks area along with the blood which was found in his colostomy and urology bags. During JV 4 day stay at the above named facility he was given a blood transfusion which 10 units of blood and 4 pints of plasma was given to him. ...

(Complaint, ¶ 6 (emphasis added).) Plaintiff also alleges that all defendants failed to provide necessary physical therapy for Plaintiff, intentionally failed to provide proper medical treatment for plaintiff in order to save time and money, failed

to set policies and procedures for the administration of blood thinners, refused to provide essential care by denying Plaintiff the prescribed medication and physical therapy after the emergency, packed Plaintiff's wounds without properly examining him or reviewing his medical records, and intentionally ignored his complaints of constant and severe pain. (Complaint, First Cause of Action, ¶ 11.) Finally, in the caption of the Complaint, Defendant Lynn Kwap is identified as the "Nurse Director."

Defendant Lynn Kwap has moved to dismiss the Complaint on the following grounds: (1) Plaintiff spoke with Defendant Kwap only on the subject of the motorized wheelchair, and her response that she would look into the matter belies any claim of deliberate indifference, (2) any claim that Defendant Kwap is responsible for the failure of others to repair the wheelchair is based on an untenable theory of vicarious liability, and (3) to the extent the Complaint could be construed as including a state law claim of medical malpractice, there is no allegation that Defendant Kwap was involved in Plaintiff's medical care. The Motion [75] is unopposed.[2]

---

[2] Even where a motion to dismiss is unopposed, the Court must still undertake an analysis of the motion's merits, at least when the nonmovant is not represented by counsel. Chocallo v. IRS Dept. of Treasury, 145 Fed. Appx. 746, 747-8 (3d Cir.2005). See also Stackhouse v. Mazurkiewicz, 951 F.2d 29, 30 (3d Cir.1992) ("[I]f a motion to dismiss is granted solely because it has not been opposed, the case is simply not being dismissed

## II. DISMISSAL FOR FAILURE TO STATE A CLAIM

This Court must dismiss, at any time, certain in forma pauperis and prisoner actions that are frivolous, malicious, fail to state a claim, or seek monetary relief from a defendant who is immune from such relief. See 28 U.S.C. § 1915(e)(2) (in forma pauperis actions); 28 U.S.C. § 1915A (actions in which prisoner seeks redress from a governmental defendant); 42 U.S.C. § 1997e (prisoner actions brought with respect to prison conditions). See also Fed.R.Civ.P. 12(b)(6), permitting a party to move to dismiss a claim in a civil action for "failure to state a claim upon which relief can be granted."

In determining the sufficiency of a pro se complaint, the Court must be mindful to construe it liberally in favor of the plaintiff. Haines v. Kerner, 404 U.S. 519, 520-21 (1972); United States v. Day, 969 F.2d 39, 42 (3d Cir. 1992). The Court must "accept as true all of the allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the plaintiff." Morse v. Lower Merion School Dist., 132 F.3d 902, 906 (3d Cir. 1997).

In addition, any complaint must comply with the pleading requirements of the Federal Rules of Civil Procedure.

---

because the complaint has failed to state a claim upon which relief may be granted. Rather, it is dismissed as a sanction[.]").

Rule 8(a)(2) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." A complaint must plead facts sufficient at least to "suggest" a basis for liability. Spruill v. Gillis, 372 F.3d 218, 236 n.12 (3d Cir. 2004). "Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'" Erickson v. Pardus, 551 U.S. 89, 93 (2007) (citations omitted).

> While a complaint ... does not need detailed factual allegations, a plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do, see Papasan v. Allain, 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986) (on a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation"). Factual allegations must be enough to raise a right to relief above the speculative level ... .

Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007) (citations omitted).

The Court of Appeals for the Third Circuit has held, in the context of a § 1983 civil rights action, that the Twombly pleading standard applies outside the § 1 antitrust context in which it was decided. See Phillips v. County of Allegheny, 515 F.3d 224, 234 (3d Cir. 2008) ("we decline at this point to read Twombly so narrowly as to limit its holding on plausibility to the antitrust context").

> Context matters in notice pleading. Fair notice under Rule 8(a)(2) depends on the type of case -- some

> complaints will require at least some factual allegations to make out a "showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the ... claim is and the grounds upon which it rests." Indeed, taking Twombly and the Court's contemporaneous opinion in Erickson v. Pardus, 127 S.Ct. 2197 (2007), together, we understand the Court to instruct that a situation may arise where, at some point, the factual detail in a complaint is so undeveloped that it does not provide a defendant the type of notice of claim which is contemplated by Rule 8. Put another way, in light of Twombly, Rule 8(a)(2) requires a "showing" rather than a blanket assertion of an entitlement to relief. We caution that without some factual allegation in the complaint, a claimant cannot satisfy the requirement that he or she provide not only "fair notice," but also the "grounds" on which the claim rests.

Phillips, 515 F.3d at 232 (citations omitted).

More recently, the Supreme Court has emphasized that, when assessing the sufficiency of any civil complaint, a court must distinguish factual contentions -- which allege behavior on the part of the defendant that, if true, would satisfy one or more elements of the claim asserted -- and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009). Although the Court must assume the veracity of the facts asserted in the complaint, it is "not bound to accept as true a legal conclusion couched as a factual allegation." Id. at 1950. Thus, "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." Id.

> Therefore, after Iqbal, when presented with a motion to dismiss for failure to state a claim, district courts should conduct a two-part analysis. First, the factual and legal elements of a claim should be separated. The District Court must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions. Second, a District Court must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a "plausible claim for relief." In other words, a complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to "show" such an entitlement with its facts. See Phillips, 515 F.3d at 234-35. As the Supreme Court instructed in Iqbal, "[w]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not 'show[n]'-'that the pleader is entitled to relief.'" This "plausibility" determination will be "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."

Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009) (citations omitted).

## III. DISCUSSION

The Eighth Amendment to the United States Constitution, applicable to the individual states through the Fourteenth Amendment, prohibits the states from inflicting "cruel and unusual punishments" on those convicted of crimes. Rhodes v. Chapman, 452 U.S. 337, 344-46 (1981). This proscription against cruel and unusual punishment requires that prison officials provide inmates with adequate medical care. Estelle v. Gamble, 429 U.S. 97, 103-04 (1976). In order to set forth a cognizable claim for a violation of his right to adequate medical care, an inmate must allege: (1) a serious medical need; and (2) behavior

on the part of prison officials that constitutes deliberate indifference to that need. Id. at 106.

To satisfy the first prong of the Estelle inquiry, the inmate must demonstrate that his medical needs are serious. "Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" Hudson v. McMillian, 503 U.S. 1, 9 (1992). Serious medical needs include those that have been diagnosed by a physician as requiring treatment or that are so obvious that a lay person would recognize the necessity for a doctor's attention, and those conditions which, if untreated, would result in lifelong handicap or permanent loss. Monmouth County Correctional Institutional Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987), cert. denied, 486 U.S. 1006 (1988).

The second element of the Estelle test requires an inmate to show that prison officials acted with deliberate indifference to his serious medical need. "Deliberate indifference" is more than mere malpractice or negligence; it is a state of mind equivalent to reckless disregard of a known risk of harm. Farmer v. Brennan, 511 U.S. 825, 837-38 (1994). Furthermore, a prisoner's subjective dissatisfaction with his medical care does not in itself indicate deliberate indifference. Andrews v. Camden County, 95 F.Supp.2d 217, 228 (D.N.J. 2000); Peterson v. Davis,

551 F.Supp. 137, 145 (D. Md. 1982), aff'd, 729 F.2d 1453 (4th Cir. 1984). Similarly, "mere disagreements over medical judgment do not state Eighth Amendment claims." White v. Napoleon, 897 F.2d 103, 110 (3d Cir. 1990). "Courts will disavow any attempt to second-guess the propriety or adequacy of a particular course of treatment ... [which] remains a question of sound professional judgment. Implicit in this deference to prison medical authorities is the assumption that such informed judgment has, in fact, been made." Inmates of Allegheny County Jail v. Pierce, 612 F.2d 754, 762 (3d Cir. 1979) (internal quotation and citation omitted) (emphasis added). Even if a doctor's judgment concerning the proper course of a prisoner's treatment ultimately is shown to be mistaken, at most what would be proved is medical malpractice and not an Eighth Amendment violation. Estelle, 429 U.S. at 105-06; White, 897 F.2d at 110.

"Where prison authorities deny reasonable requests for medical treatment, however, and such denial exposes the inmate 'to undue suffering or the threat of tangible residual injury,' deliberate indifference is manifest. Similarly, where 'knowledge of the need for medical care [is accompanied by the] ... intentional refusal to provide that care,' the deliberate indifference standard has been met. ... Finally, deliberate indifference is demonstrated '[w]hen ... prison authorities prevent an inmate from receiving recommended treatment for

serious medical needs or deny access to a physician capable of evaluating the need for such treatment." Monmouth County Corr. Inst. Inmates v. Lanzaro, 834 F.2d at 346 (citations omitted). "Short of absolute denial, 'if necessary medical treatment [i]s ... delayed for non-medical reasons, a case of deliberate indifference has been made out." Id. (citations omitted). "Deliberate indifference is also evident where prison officials erect arbitrary and burdensome procedures that 'result[] in interminable delays and outright denials of medical care to suffering inmates.'" Id. at 347 (citation omitted).

Here, this Court disagrees with Defendant Kwap's characterization of the factual allegations against her as being limited to a discussion of the repair of Plaintiff's wheelchair. To the contrary, Plaintiff alleges that Defendant Kwap, acting personally in her role as a nursing supervisor, participated with other medical personnel in an examination of Plaintiff after several days of excessive internal and external bleeding and only a few hours before his condition had deteriorated to the point that he required emergency hospital care, that she was present when he asked to be transferred to the hospital but that request was denied, that she failed to put into place appropriate policies regarding the administration of blood thinners, and that she (along with all other defendants) failed to provide prescribed follow-up care. Plaintiff alleges that the medical

care he received was cursory, that Defendant Kwap, along with the other medical personnel, failed to take the time to properly examine him or review his medical records. Plaintiff alleges that the approach to his medical care, in which Defendant Kwap participated, was motivated by concerns about time and money, rather than the provision of appropriate care.

In addition, contrary to Defendant Kwap's characterization of the allegations of the Complaint, Plaintiff does not attempt to rest Defendant Kwap's liability on an untenable theory of vicarious liability.[3] Instead, Plaintiff alleges that Defendant Kwap personally participated in care decisions related to Plaintiff's serious medical needs, both before and after his hospitalization.

As noted above, "[i]mplicit in this deference to prison medical authorities is the assumption that such informed judgment has, in fact, been made." Inmates of Allegheny County Jail v. Pierce, 612 F.2d 754, 762 (3d Cir. 1979) (internal quotation and citation omitted). Thus, "an inadvertent failure to provide adequate medical care cannot be said to constitute 'an unnecessary and wanton infliction of pain' or 'to be repugnant to the conscience of mankind.'" Estelle, 429 U.S. at 105-06

[3] This Court agrees that it is well-settled that the doctrine of respondeat superior cannot be a basis for Section 1983 liability. See Monell v. New York City Dept. of Soc. Servs, 436 U.S. 658, 691 (1978); Durmer v. O'Carroll, 991 F.2d 64, 69 n.14 (3d Cir. 1993).

(emphasis added). Here, however, the facts alleged do not suggest an inadvertent failure to provide adequate medical care. To the contrary, the allegations are that the approach to Plaintiff's care directly resulted from Defendant Kwap's failure to implement appropriate policies regarding administration of blood thinners, motivated by concerns about time and money rather than quality of care, and from Defendant Kwap's failure to direct appropriate care following her participation in an examination of Plaintiff after several days of excessive bleeding and complaints of pain, and from Defendant Kwap's failure to provide appropriate follow-up care after Plaintiff's discharge from the hospital.

The allegations of the Complaint are sufficient to permit an inference of "deliberate indifference." Cf., e.g., White v. Napoleon, 897 F.2d 103, 109 (3d Cir. 1990) (from persistent conduct in the face of resultant pain and risk of permanent injury, one reasonably may infer that the doctor is either intentionally inflicting pain on prisoners or is deliberately indifferent to their medical needs).

Of course, Plaintiff must, in the future, come forward with evidence to establish the truth of these allegations. All this Court holds at this juncture is that the allegations are sufficient to avoid dismissal.

## IV. CONCLUSION

For the reasons set forth above, the Motion [75] to dismiss will be denied.[4] An appropriate order follows.

s/Robert B. Kugler
Robert B. Kugler
United States District Judge

Dated: November 30, 2011

[4] As this Court has held that the constitutional claims will not be dismissed, this Court also will decline to dismiss the pendent state law claims for medical malpractice.